**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MADELYN CARRASCO** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 1306** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Madelyn Carrasco seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now affirms the Commissioner's decision.

## PROCEDURAL HISTORY

On April 27, 2011, Plaintiff (at age 59) applied for DIB, alleging that she has been disabled since November 8, 2010 due to arthritis, lupus, diabetes, hepatitis C and a heart condition. (R. 153, 156). On July 9, 2011, Plaintiff indicated in a Function Report, among other things, that she was also suffering from fibromyalgia. (R. 162). The Social Security Administration denied Plaintiff's application initially on September 12, 2011, and again upon reconsideration on December 15, 2011. (R. 39-40). She then filed a timely request for hearing and appeared before Administrative Law Judge David

Skidmore (the "ALJ") on October 9, 2012.  (R. 17-37).  The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Jill Radke (the "VE").  Shortly thereafter, on November 2, 2012, the ALJ found that Plaintiff is not disabled because she is capable of performing her past light duty work as a security guard.  (R. 44-53).  The Appeals Council denied Plaintiff's request for review, (R. 1-6), and she now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for reversal or remand of the ALJ's decision, Plaintiff first argues that the ALJ erred in evaluating her credibility because he used "meaningless boilerplate" language, "drew inferences against [her] without laying the proper foundation to do so[,]" and failed to discuss some of her medication side effects. (Doc. 13, at 4-12; Doc. 22, at 1-3).  She also argues that he erred when determining her residual functional capacity ("RFC") by failing to consider the combined effects of all of her impairments, and particularly her bunions, fibromyalgia, and obesity.  (Doc. 13, at 12-16; Doc. 22, at 4-9).  As discussed below, the Court finds no merit to these arguments.

## FACTUAL BACKGROUND

Plaintiff was 61 years old and living alone in her home at the time of the ALJ's decision.  (R. 21, 24).  She had completed high school and earned some college credits, worked as a CTA bus driver for many years, and then worked most recently for Chicago Public Schools as a security guard in a high school for 20 years.  (R. 21, 25, 157).  She stopped working on November 8, 2010 because her security guard job required her to "just keep walking, keep being mobile" and she felt she could no longer

perform those duties due to pain and swelling in her knees, and pain in her ankles and feet.  (R. 25-26).

## A.    Medical History

### 1.    2010

Plaintiff's earliest medical records from February 2010 show she was diagnosed with high cholesterol, osteoarthritis, coronary artery disease (treated with a stent), hypertension, and hepatitis C.  (R. 335).  She was admitted to the emergency room at Rush University Medical Center on February 10, 2010 because of chest pain and heart palpitations.  (R. 207-15).  Since her physical exam and stress test were normal, she was quickly discharged with instructions to follow up with her regular physician.  (*Id.*).  On February 16, 2010, Plaintiff followed-up with her family practitioner at Rush, Dr. Miguel Salas.  (R. 339).  She reported being asymptomatic at that time, and her physical exam was normal.  (R. 339-41).  However, Dr. Salas found that Plaintiff had high blood pressure, high cholesterol, and was obese (weighing 188 pounds at 5'4" in height), so he prescribed blood pressure and cholesterol medications, and recommended daily exercise and diet changes.  (R. 341-42).

At a March 2010 follow-up with Dr. Salas to go over lab work results, Plaintiff's cholesterol and blood pressure had not improved, but she refused additional medications.  (R. 353).  She was reminded to improve her diet and to exercise.  (*Id.*).  Dr. Salas also diagnosed Plaintiff with Type II diabetes, but found she was "completely asymptomatic."  (R. 348, 352-53).  Dr. Salas noted at an April 2010 follow-up that Plaintiff had lost weight (down to 182 pounds) and she was still "completely asymptomatic."  (R. 361, 363).  A few months later, at a July 2010 appointment with Dr.

Salas, Plaintiff complained of moderate lower back pain that sometimes radiated to her left thigh. (R. 372). It was dull, and was relieved by rest or NSAIDs. (*Id.*). Her physical examination was again normal, including a normal gait, a full range of motion, normal strength, and no redness, swelling or warmth in the joints. (R. 373). Dr. Salas recommended ibuprofen as needed, physical therapy, and exercise. (R. 375).

On October 12, 2010, Plaintiff again visited Dr. Salas, complaining of generalized joint pain, a cyst on her left foot, and pain in her foot joints. (R. 392). Plaintiff said her pain was mostly controlled with Motrin, but her foot issues also limited her ability to walk for long periods of time. (R. 386). Dr. Salas noted that Plaintiff had a bunion on the right foot and calluses on her feet, and she reported previous foot surgeries. (R. 386, 389). Her physical examination was normal, including her gait, strength, range of motion, and muscle tone, and her joints had no redness, warmth or swelling. (R. 387, 389, 393). Plaintiff was recommended to increase her ibuprofen to relieve her joint pain and increase her blood pressure medication, but she declined the increased blood pressure medication, stating she instead planned to exercise more once her feet felt better. (R. 390). Dr. Salas also recommended Plaintiff keep up her physical activity, and referred her to a podiatrist for her foot issues. (R. 395). The record does not show that Plaintiff visited any podiatrist at this time.

On November 8, 2010, Plaintiff stopped working. The next day, she visited Dr. Joel Augustin, an internist at Rush, complaining of several days of pain in the tailbone, left hip, left knee, left ankle, and chest pain. (R. 410). She sought a referral to an orthopedic specialist. (*Id.*). Dr. Augustin's examination revealed tenderness of Plaintiff's lumbar spine and coccyx area and mild tenderness in the chest, but no

redness, warmth, swelling or tenderness in her joints, a full range of motion, and a negative straight leg raise test. (R. 411). The internist recommended x-rays and told Plaintiff he could not refer her to an orthopedic specialist without performing any imaging studies. (R. 411, 414). Plaintiff's November 9, 2010 knee x-rays showed "scattered mild to moderate drain with marginal osteophyte formation" in the left knee, consistent with osteoarthritis. (R. 450). Her lumbar spine x-ray showed some minimal decrease in disk height at L5, small anterior osteophytes in the lower spine, and joint inflammation at the L5-S1 level. (R. 461-62). A pelvic x-ray showed Plaintiff's coccyx was unremarkable, but she had mild degenerative narrowing in the SI joints and moderate degenerative narrowing in the joint between the two pubic bones. (R. 463).

About a week later, on November 16, 2010, Plaintiff visited Dr. Salas, complaining of "a lot" of joint pain, particularly in the right shoulder, knees and lumbar spine. (R. 418, 423). She was also crying in the doctor's office due to "personal issues and body aches" and said her pain was keeping her from sleeping and working. (*Id.*). Other than joint tenderness, her physical exam was normal, including a full range of motion, full motor strength, and no redness, warmth or swelling in the joints. (R. 424). The doctor also noted Plaintiff had lost some weight (she was then at 180 pounds). (*Id.*). Dr. Salas noted that Plaintiff was not progressing in her physical therapy at home, and recommended more physical activity. (R. 425). He prescribed Tramadol and Lidocaine patches for her pain. (R. 425). The doctor also noted that Plaintiff's diabetes was controlled with her diet. (R. 216).

A few days later, on November 23, 2010, Plaintiff returned to Dr. Salas' office to have disability forms completed, stating she "wants to retire and then have enough time

to improve her symptoms" and she was "requesting FMLA to do so." (R. 436). Plaintiff complained of intense joint pain and pain all over her body, stated her job was too demanding, and said she had been crying due to pain and feeling like her "disease" was "consuming her life." (*Id.*). Her physical exam was normal except for generalized joint tenderness and "mild deformity" of the knees. (R. 438). Dr. Salas recommended Plaintiff use more Tylenol and again recommended physical therapy. (R. 439). The doctor also wrote Plaintiff a note stating she would be released to work on November 29, 2010. (R. 440).

On December 5, 2010, Plaintiff followed-up with Dr. Salas to discuss her FMLA forms, and stated she was feeling better. (R. 448). She also reported that she wanted to "retire sooner rather than later." (R. 450). Upon examination, Plaintiff displayed some mild tenderness in her joints, particularly the knees, but her exam was otherwise normal. (*Id.*). Dr. Salas recommended continued physical activity and Tylenol for pain, and noted that Plaintiff refused "ortho intervention." (*Id.*).

Plaintiff visited Dr. Salas again on December 30, 2010 for help with more FLMA forms. (R. 460). The doctor noted that before Plaintiff came in, he and she spoke on the phone, and he suggested she could return to work with pain medication and physical therapy. (*Id.*). Plaintiff "refused completely the idea to return to work" because she felt she was unable to work in her condition. (*Id.*). Once again, her physical examination at this time was normal, including a normal walk, full range of motion and full motor strength, except for some joint and lumbar spine tenderness and some mild knee swelling. (R. 461). Her weight was also down to 177 pounds. (*Id.*). Dr. Salas also reviewed Plaintiff's November 2010 x-rays and believed they potentially showed

facet syndrome.[1]  (R. 463).  The doctor recommended Plaintiff get a second opinion, including for the possibility of fibromyalgia, and in case Plaintiff sought to refrain from working after January 29, 2011, the date through which he extended her disability leave.  (*Id.*).  The doctor also recommended an orthopedic examination and bone loss medication, both of which Plaintiff refused.  (*Id.*).  Finally, the doctor referred Plaintiff to a rehabilitation specialist.  (*Id.*).

### 2.    2011

Plaintiff followed-up with Dr. Salas on January 27, 2011, and told the doctor that she did not go to the rehabilitation specialist he recommended because she did not have the money to pay for it, and because "they do not deal with diagnosis [sic] like fibromyalgia."  (R. 220).  Dr. Salas told Plaintiff he needed the opinions of specialists to support her claim that she was "100% not capable to work anymore" since his prior analysis had been based "mainly on [Plaintiff's] statements" and he now needed a "scientific opinion."  (*Id.*).  He requested she see a rehabilitation medicine specialist, a rheumatologist, and a podiatrist before he could agree to support extending her disability leave again.  (*Id.*).

A few days later, on February 1, 2011, Plaintiff followed-up again with Dr. Salas so that he could complete forms to extend her disability leave.  (R. 227).  Plaintiff also told the doctor that all her joints were sore and "she decided not to work anymore."  (*Id.*).  The doctor noted that after months of not following his recommendations, Plaintiff had now made appointments with a podiatrist, a rheumatologist, and a rehabilitation

---

[1]        "Facet syndrome" is "[a] low back pain syndrome attributed to osteoarthritis of the interarticular vertebrae."   http://medical-dictionary.thefreedictionary.com/Facet+Syndrome   (all websites in this opinion were last visited May 26, 2015).

specialist, and was going to start physical therapy. (*Id.*). The doctor further wrote that his physical examination results thus far only allowed him to diagnose Plaintiff with "incipient Osteoarthritis not at the point for permanent disability" but he would consider the other specialists' forthcoming opinions. (*Id.*). The doctor extended Plaintiff's leave until February 15, 2011 in the meantime. (*Id.*).

On February 16, 2011, Plaintiff returned to Dr. Salas to have forms completed for another FMLA leave extension. (R. 237). Her physical exam was normal, but the doctor was concerned that her blood pressure was high despite her statements that she was medication compliant and was dieting. (R. 238-42). Notably, when Plaintiff told Dr. Salas she was taking all of her medications (including Tramadol), she did not state she was suffering any side effects. (*Id.*). The doctor recommended additional diet changes and exercise, including moderate jogging 3 to 5 days a week. (*Id.*).

A couple of weeks later, on February 24, 2011, Plaintiff returned to see Dr. Salas for another extension of her disability leave. (R. 249). She had finally seen the rehabilitation specialist, Dr. Merrie Viscarra, who according to Dr. Salas' notes, had diagnosed Plaintiff with chronic generalized pain and recommended physical therapy (the record contains no notes from Dr. Viscarra herself). (*Id.*). Plaintiff's physical exam by Dr. Salas at this time was normal, but he extended her disability leave until March 9, 2011 so that he could evaluate further assessments by Dr. Viscarra and the other specialists. (R. 250-51).

Plaintiff followed-up with Dr. Salas on March 22, 2011, reporting that she recently had lab work done and visited Dr. Antoine Sreih, a rheumatologist, and Dr. Allan Shoelson, a podiatrist. (R. 259). There are no notes or reports from these specialists'

consultations at this time in the record, but Dr. Salas recorded some information in his notes that he learned from Dr. Sreih. Specifically, he noted that Dr. Sreih recommended Plaintiff be off work until April 11, 2011 so that she could start new medications for her generalized joint pain. (R. 263). Dr. Salas also added a provisional diagnosis of lupus to Plaintiff's file based on Dr. Sreih's findings (which are not detailed in Dr. Salas' notes), discontinued her ibuprofen, and noted she was starting Plaquenil on Dr. Sreih's recommendation. (R. 262). Dr. Salas also found that Plaintiff's cholesterol had improved and her diabetes was controlled, with no episodes of hypoglycemia or other symptoms or complications. (*Id.*). Plaintiff reported that she was walking for 30 minutes a day, 3-5 times per week. (R. 263). Her exam at this time was normal, except for joint tenderness and pain during her range of motion testing. (R. 260). The doctor also noted that Plaintiff's weight was down to 175 pounds and her BMI was lower. (R. 258-59). However, her blood pressure was still high. (R. 262).

On April 1, 2011, Plaintiff visited Dr. Steven Rothschild, a geriatric medicine specialist, complaining of low back, left knee and left foot pain, and seeking to have disability forms completed. (R. 270). She told him that Dr. Shoelson, her podiatrist, had given her injections which had reduced her foot pain, and that her physical therapy was "helping somewhat." (R. 271). She also said she became lightheaded on Plaquenil so she stopped taking it, but reported no other medication side effects. (*Id.*). Plaintiff also told Dr. Rothschild that she cannot work as a security guard because she cannot be on her feet all day, and that she was considering applying for permanent disability benefits. (*Id.*).

Dr. Rothschild noted that Plaintiff had been seeing Dr. Salas and that her "[w]ork-up [was] mostly non-contributory" and "concerns have been raised regarding somatization disorder or factitious disorder—Dr. Salas has observed patient walking briskly through parking lot here, although in severe pain in clinic."[2] (R. 271). The doctor further wrote that Plaintiff was moving slowly but without difficulty in his office. (R. 272). He concluded that he agreed with Dr. Salas' recommendations to continue Plaintiff's physical therapy and medication while awaiting further information from her specialists. (*Id.*). Dr. Rothschild also extended her disability until April 22, 2011. (*Id.*).

A week later, on April 8, 2011, Plaintiff returned to visit Dr. Rothschild in tears, stating that her employer interpreted Dr. Salas' paperwork as indicating she could immediately return to work. (R. 279). She also stated that she could not tolerate Plaquenil because of palpitations, and Dr. Rothschild noted that at her last visit she mentioned lightheadedness from that medication, not palpitations. (*Id.*). She reported no side effects from her other medications. The doctor also noted Plaintiff complained of pain in the neck, low back, hips, ankles, feet and shoulders, but she had no red, inflamed joints or swelling, and she reported her Lidocaine patches and physical therapy had been helping "a lot." (*Id.*). Plaintiff further reported being able to walk to the store near her house, walk or stand for 30 minutes without sitting down, and the physical therapist noted Plaintiff could stand for up to 60 minutes. (*Id.*). Dr. Rothschild examined Plaintiff and noted she could walk well, was able to pull her shirt on and use

---

[2] "Somatization disorder" is "[a] disorder characterized by an individual's seeking help for and acquiring a complicated medical history of multiple physical symptoms referring to a variety of organ systems, but for whose complaints there is no detectable organic disorder or injury." http://medical-dictionary.thefreedictionary.com/somatization+disorder. "Factitious disorder" is "[a] disorder in which the physical or psychological symptoms are under voluntary control." http://medical-dictionary.thefreedictionary.com/Factitious+disorder.

both her upper extremities with adequate range of motion (despite her complaints of pain and limitations with her right shoulder), and she was otherwise normal except for some complaints of pain in the hips. (R. 281).

Dr. Rothschild concluded that Plaintiff had been given various diagnoses, including possible lupus, had somewhat inconsistent examinations "with improved function when she is unaware of being observed[,]" and had a "significant emotional overlay aggravating her condition." (R. 281). He was unsure whether her behavior was volitional or the result of stress. (*Id.*). The doctor gave Plaintiff a letter for her employer indicating she was on medical leave through April 22, 2011 on the advice of several of her doctors, and recommended she contact Dr. Sreih to change her medication. (R. 281-82). He also noted Plaintiff's high blood pressure might require increased medications, but Plaintiff raised concerns regarding costs. (R. 281). The doctor further advised Plaintiff to continue dieting and losing weight, including to avoid potential hepatitis C complications from having a "fatty liver." (*Id.*).

Plaintiff followed-up with Dr. Rothschild on April 22, 2011 to have her disability leave extension forms completed, and review lab work results. (R. 290-91). Plaintiff reported that she had visited Dr. Sreih, who recommended she try Plaquenil again at a decreased dosage because it was a very effective medication, and she agreed to this plan. (R. 291). Plaintiff also reported having an injection in her ankle that made the pain there somewhat better, and said she was continuing to attend physical therapy twice a week. (*Id.*). According to Dr. Rothschild's notes, Plaintiff's hepatologist, Dr. Dhillon, was concerned about her liver and recommended hepatitis vaccinations and continuation of her disability leave to allow for medication adjustment, liver monitoring,

and "aggressive" physical therapy. (R. 291, 296). Dr. Dhillon's notes from this consultation are not in the record. Dr. Rothschild extended Plaintiff's disability leave for eight more weeks, and noted that she was developing "better endurance, albeit very gradually, with continued pain." (R. 296). Plaintiff applied for disability benefits through the Social Security Administration a few days later, on April 27, 2011. (R. 153, 156).

Plaintiff scheduled appointments with Drs. Shoelson, Dhillon and Rothschild in late May and early June 2011, but there are no notes or reports concerning those visits in the record. (R. 302). On June 2, 2011, Dr. Viscarra filled-out a Physical Residual Functional Capacity Questionnaire form in support of Plaintiff's disability claim. (R. 304-08). Dr. Viscarra wrote that she had seen Plaintiff once a month for the previous four months, and thought her prognosis was "good." (R. 304). The doctor further indicated Plaintiff's pain was made worse with movement, walking, and prolonged sitting and standing; that she could walk up to two blocks without severe pain; that she could sit or stand for up to 20 minutes before needing a break; and that she could sit, stand or walk for less than 2 hours in an 8 hour workday. (R. 304-06). In the section of the report asking what treatments Plaintiff was undergoing and whether she was suffering any side effects, Dr. Viscarra wrote that Plaintiff was attending physical therapy and taking Tramadol and ibuprofen, and listed no medication side effects. (R. 304). There are no treatment notes or reports from Dr. Viscarra in the record to support her questionnaire form responses.

On July 12, 2011, Plaintiff visited Dr. Augustin, complaining of leg and coccyx pain, and seeking medication. (R. 473). The doctor also noted Plaintiff's weight was at 176 pounds. (R. 476). Plaintiff's straight leg test was negative and the doctor was

unsure of her degree of pain, so he offered to refer Plaintiff to a pain clinic. (*Id.*). Plaintiff declined the referral, so Dr. Augustin prescribed Motrin. (*Id.*).

On August 31, 2011, Plaintiff was examined by Dr. Charles Carlton, a state agency physician, to evaluate her disability claim. (R. 309-17). Dr. Carlton reviewed medical records from Dr. Salas and Plaintiff's February 2011 emergency room records. (R. 310). Plaintiff also reported to Dr. Carlton that she had been diagnosed by her rheumatologist with lupus that she was treating with Plaquenil, and fibromyalgia that she was treating with Lyrica. (R. 309). She did not describe any medication side effects. She also reported being diagnosed with diabetes and hepatitis C, which she had not been treated for, other than recommendations for weight loss and lifestyle modification. (R. 310). Plaintiff further stated she could walk about 1 or 2 blocks before experiencing hip, knee and low back pain. (*Id.*). At the time, she was living in a second-floor apartment. (*Id.*).

Dr. Carlton found Plaintiff was obese (he had her weight at 188 pounds, apparently based on Dr. Salas' early 2010 notes); had a slow and guarded gait; avoided complete weight-bearing on the right leg; had some range of motion limitations in the hips, knees, and lumbar spine; and complained of "multiple tender points throughout her body consistent with a pattern of a chronic pain syndrome such as fibromyalgia." (R. 311-12). She was, however, able to walk 50 feet without any assistance; had a full, painless range of motion in all joints except the hips and knees; her joints were normal in appearance; and she had normal motor strength. (R. 312). His overall "impression" was that Plaintiff suffered from obesity, arthritis, lupus, diabetes, hepatitis C, and chronic back and knee pain, and had a history of coronary artery disease post

angioplasty. (R. 312-13). Dr. Carlton further determined Plaintiff could lift up to 20 pounds, and that she had mild limitations in walking on her toes, heels, tandem walking and in getting on and off the exam table, but severe limitations in squatting and "arising." (R. 313). The doctor concluded his report by stating that at the end of his examination he asked Plaintiff if all of her medical complaints were addressed, and she "responded affirmatively." (*Id.*).

Plaintiff also underwent right knee and lumbar spine x-rays on August 31, 2011 for her disability evaluation. (R. 318-19). The x-rays showed a mild narrowing and minimal degenerative changes in her knee, and mild narrowing and possible mild joint degeneration in the spine. (*Id.*). A few days later, on September 9, 2011, a state agency examiner, Dr. David Mack, prepared a Physical Residual Functional Capacity Assessment for evaluating Plaintiff's disability claim. (R. 320-27). Dr. Mack found Plaintiff is capable of light work, but limited to occasional climbing of ramps, stairs, ladders, ropes and scaffolds, stooping, kneeling, crouching, and crawling. (R. 321-22). Dr. Mack's determination was based on Dr. Carlton's examination report, including Plaintiff's self-reported medical history, and the August 31, 2011 x-rays. (R. 321). A few days after Dr. Mack completed his report, on September 12, 2011, Plaintiff's disability claim was denied. (R. 39).

Plaintiff's next medical records are from December 5, 2011, when she visited Dr. Augustin, complaining of knee and chest pain, and stated her knees had started giving out on her. (R. 487). Despite these complaints, Plaintiff reported she was able to perform her activities of daily living, her pain was relieved with ibuprofen and Tramadol, and she had no other issues or side effects from medications. (R. 487-89, 492). Dr.

Augustin noted Plaintiff was following the diet and medication recommendations fairly well, "achieving good outcomes" and her diabetes was under control. (R. 487, 492). The doctor also noted Plaintiff's weight fluctuated between 176 and 178 pounds over the past several months. (R. 491). Plaintiff told the doctor she "[d]oes not like" taking Lyrica and he again recommended a referral to a pain clinic, but there is no evidence in the record she followed-up. (R. 492-93). He prescribed Nitrostat for her chest pain. (R. 497).

On December 13, 2011, Dr. Francis Vincent, a state agency physician, evaluated Plaintiff's disability claim upon reconsideration. (R. 328-30). Dr. Vincent found there was no new medical source information since Dr. Mack's September 9, 2011 report, and thus he affirmed Dr. Mack's findings. (R. 330). Based on Dr. Vincent's conclusion, on December 15, 2011, Plaintiff's disability claim was denied again on appeal. (R. 40).

### 3. 2012

On January 9, 2012, Plaintiff visited Dr. Sheila Eswaran, a hepatologist, to have her hepatitis vaccine. (R. 508). She was recommended to have a liver ultrasound and follow-up in six weeks, but there are no notes or reports concerning the ultrasound or follow-up in the record. (*Id.*). About a month later, on February 2, 2012, Plaintiff visited Dr. Augustin, complaining of left knee pain and gastro-esophageal reflux issues. (R. 512). That doctor recommended Plaintiff return in April if her symptoms worsened or failed to improve, and noted her weight was down to 168 pounds, giving her a BMI of 29.31, below the obese range. (*Id.*).

A few months later, on May 26, 2012, Plaintiff visited Dr. Dhillon for a hepatology follow-up. (R. 500). Dr. Dhillon noted Plaintiff recently had a liver biopsy which showed

she had liver cirrhosis, but after a month of medication her problems had undergone a "rapid resolution." (*Id.*). He further noted that she had been diagnosed with numerous conditions, including dysthymic disorder (mild depression) and thrombocytopenia (low platelets in the blood stream), but she had lost 20 pounds over the last year and was "generally healthy." (*Id.*). Upon examination, she had no complaints of pain in her muscles or joints and no limitations in her range of motion, and although she did have some ecchymosis (skin discoloration) on her lower extremities, he noted no symptoms related to this issue. (*Id.*). The doctor also determined that although Plaintiff had tested positive for hepatitis C, she had "self eradicated [sic] the virus" and he planned on transitioning her to other medications to maintain her liver condition. (R. 501).

Plaintiff visited Dr. Augustin on June 19, 2012 for monitoring her diabetes and with complaints of a sore throat, bronchitis and a stye. (R. 515). She was given some antibiotics and cough medicine, and the doctor noted she had lost more weight (to 160 pounds). (*Id.*) On July 21, 2012, Plaintiff went for a follow-up with Dr. Dhillon, and told him that her main issue was arthritis in her right shoulder. (R. 502-03). That doctor noted no changes in Plaintiff's strength or exercise tolerance, found she still had a full range of motion, and suggested she follow up with her rheumatologist. (*Id.*).

A few days later, on July 25, 2012, Plaintiff followed-up with Dr. Sreih, as suggested by Dr. Dhillon. (R. 520-21). The notes from this visit are sparse, but show she was not given any new medications or recommended any new treatments, and was told to follow up in about two months. (*Id.*). Her weight was also recorded at 162 pounds. (*Id.*). The last notes in the record show Plaintiff visited Dr. Sreih on September 25, 2012 for "therapeutic drug monitoring" and to follow-up on her shoulder pain, was

not recommended any new treatments or medications, and was told to follow-up again in about three months. (R. 522-23). Dr. Sreih noted that, among Plaintiff's other conditions, she had a "[r]ash and other nonspecific skin eruption" and her weight remained at 162 pounds. (*Id.*).

**B.     Plaintiff's Testimony**

Plaintiff submitted a July 9, 2011 Function Report in support of her disability claim. (R. 162-170). On November 19, 2011, following that claim's denial, she submitted a second report in support of the reconsideration of her claim, which was largely the same as her earlier report. (R. 181-191). In both reports, Plaintiff wrote that she can stand no longer than 20 minutes, she is unable to sleep due to pain and cramping, and she has trouble lifting her arms to dress and wash her back due to pain. (R. 162-64, 181-83). Nevertheless, she reported doing laundry weekly, preparing sandwiches and frozen meals daily, and washing her own dishes. (*Id.*). She also wrote in both reports that she goes out four times a week, alone (including driving by herself), to church, doctors' appointments, and stores (for groceries and necessities). (R. 165-66, 184-85). Plaintiff was asked about medication usage in both reports, and she indicated in response that she took Plaquenil, which caused palpitations in the chest and back as side effects. (R. 169, 188). She did not discuss any other medication usage or side effects.

In her July 9, 2011 Function Report, Plaintiff wrote that she exercised for 30 minutes per day, (R. 163), but in the November 19, 2011 Function Report, she wrote that she could no longer exercise, (R. 182). Plaintiff's attorney also submitted a Disability Report on her behalf through the internet on November 19, 2011, indicating

among other things that she takes Lyrica and Tramadol for pain and (for the first time) that those medications make her dizzy and drowsy. (R. 177).

At the October 9, 2012 hearing before the ALJ, Plaintiff testified that she lives alone, does not drive, and is "lucky if [she] get[s] out twice a month". (R. 24). She said her daughter drove her to the hearing and also takes her to her doctors' appointments. (R. 24-25). She also said her daughter takes her shopping, and her daughter and grandchildren carry her bags for her because she cannot even lift or carry a gallon of milk. (R. 29-30). Sometimes they do the shopping for her while she stays home. (*Id.*). Plaintiff further testified that her daughter does all of her household chores and cooks for her. (R. 30-31). The ALJ noted Plaintiff stopped working in November 2010 and asked who did her housework then. (R. 30). She said "I was able to do it then, but I can't do it now." (*Id.*). When asked when she ceased to be able to take care of her house, she responded that she thought it was in "January when the weather got really cold" which made her "fingers lock up." (*Id.*). She explained that she spends her days sleeping and watching television. (R. 30-31).

Regarding her ability to work, Plaintiff testified that she stopped working due to pain and swelling in her knees, and pain in her ankles and feet, because those issues prevent her from doing her duties as a security guard, which requires her to "just keep walking, keep being mobile." (R. 26). She also said her back, hands, neck and spine hurt, and that when she walks around her house her feet hurt bad, because her bunions grew back. (R. 27-28). After walking around the table in her home, she has to rest, because her knees, ankles and back hurt. (*Id.*). However, if she sits for an extended period, "[m]y tailbone and my pelvis kill me" and she has low back pain. (R. 29). She

further testified that she takes Tramadol for her pain, but it knocks her out and makes her sleep a lot. (R. 28-29). She said her liver cirrhosis makes her "fatigued and tired" and she cannot lift her right shoulder up due to pain, which also prevents her from lifting a gallon of milk, combing her hair, and sleeping. (R. 31-32). In conclusion, she said "the pain . . . travels everywhere" and "[t]he lupus goes from the ankles, to the knees, to the hips, to the tailbone, to the pelvis, the bottom of my feet, my hands . . . ." (R. 32).

## C.    Vocational Expert's Testimony

Ms. Radke, the VE, testified that Plaintiff's past work as a security guard was a semi-skilled, light position, and that a person who was limited to light work but could do no more than occasional climbing, stooping, kneeling, crouching or crawling could perform that past work. (R. 34-35). She further testified that the person's ability to climb ladders, ropes or scaffolds would not affect their ability to do a security guard job. (R. 35). In response to Plaintiff's counsel's questioning, the VE testified that a person who needed an unscheduled break every hour could not do a security guard job. (R. 36).

## D.    Administrative Law Judge's Decision

The ALJ found that Plaintiff's lupus and arthritis are severe impairments, her hepatitis C, kidney disease, diabetes, hypertension and coronary artery disease are not severe impairments, and none of her impairments alone or in combination meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 46-47). After reviewing the record in detail, the ALJ determined that Plaintiff has the capacity to perform light work, except she can only occasionally stoop, kneel, crouch, crawl or climb ramps or stairs and can never climb ladders, ropes or scaffolds. (R. 47).

In reaching this conclusion, the ALJ gave moderate weight to the August 31, 2011 opinion by Dr. Carlton, the state consultative examiner; great weight to the September 9, 2011 opinion by Dr. Mack, the state agency physician reviewer; and little weight to the June 2, 2011 opinion by Dr. Viscarra, Plaintiff's treating rehabilitation specialist who had treated her once a month for four months by the time of that opinion. (R. 51-52). The ALJ also credited the reports from Plaintiff's treating doctors and found that their notes, opinions and findings seriously undermined her credibility and showed her condition was not as severe as she sought to portray it to the ALJ. (R. 48-49). Finally, based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing her prior work as a security guard, and found that she is therefore not disabled and does not qualify for disability benefits. (R. 52).

## LEGAL STANDARDS

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). This Court's task is instead to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [the] conclusion that the claimant is not disabled." *Simila v. Astru*e, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. 42 U.S.C. § 423(a)(1)(E); *Rapsin v. Astrue*, No. 10 C 318, 2011 WL 3704227, at *5 (N.D. Ill. Aug. 22, 2011). A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

<u>**ANALYSIS**</u>

**A.     Credibility Determination**

**1.      Boilerplate Language**

Plaintiff first argues that the ALJ failed to properly evaluate her credibility because he used "meaningless boilerplate" language. (Doc. 13, at 3-4). The Court easily dispenses with this argument. True, the ALJ's credibility analysis began with the familiar boilerplate language: Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" stated RFC assessment. (R. 48). And as she points out, the Seventh Circuit has repeatedly criticized this language as meaningless and unreviewable. *See, e.g.*, *Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015). But where, as in this case, the ALJ also provides a detailed discussion of the reasons he did not find a claimant's testimony fully credible, the use of the boilerplate alone does not provide a basis for remand. *See, e.g.*, *Gully v. Colvin*, 593 F. App'x 558, 563 (7th Cir. 2014) (citations omitted).

**2.      ALJ's Credibility Inferences**

Turning to Plaintiff's more substantive credibility arguments, she also contends that the ALJ erred by drawing inferences against her without "laying the proper foundation to do so" by seeking an explanation from her. (Doc. 13, at 6-12; Doc. 22, at 1-3). Under Social Security Ruling 96-7p, an ALJ must "consider the entire case record" in making a credibility determination, and must give "specific reasons for the finding on credibility, supported by the evidence in the case record[.]" *Schreiber v. Colvin*, 519 F.

App'x 951, 960 (7th Cir. 2013) (quoting SSR 96-7p, 1996 WL 374186, at *4). So long as the ALJ's reasoning is supported by substantial evidence, "we will not overturn his credibility determination unless it is patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (citing *Pepper v. Colvin,* 712 F.3d 351, 367 (7th Cir. 2013)). Here, the Court finds that the ALJ's credibility determination is sufficiently explained and supported by substantial evidence, and does not require remand.

The ALJ's detailed credibility analysis in this case begins by summarizing Plaintiff's allegations that her condition worsened over time, that she can sit, walk or stand only for short periods, and that she experiences pain virtually everywhere, but particularly in her knees, ankles and feet. (R. 47). The ALJ also wrote that Plaintiff testified that she cannot lift a gallon of milk, and that her daughter and grandchildren carry all of her groceries and do her housekeeping. (*Id.*). The ALJ then noted that Plaintiff's "Function Report, completed in July of 2011, contradicts some of the claimant's testimony" since she indicated in that report that she shopped, cooked meals, cleaned her dishes, did laundry, and took walks for up to 20 minutes. (R. 47-48).

Following this summary, the ALJ wrote that Plaintiff is "less than fully credible about the alleged pain and limitations she experiences from her impairments." (R. 48). The ALJ discussed that he discounted Plaintiff's testimony based on her providers' opinions, starting with Dr. Rothschild. He found that Dr. Rothschild's April 8, 2011 opinion that Plaintiff had "improved function when she is unaware of being observed" and that her "significant emotional overlay aggravating her condition" could be "volitional/factitious" do not support Plaintiff's claim. (R. 48). The ALJ also relied on Dr. Rothschild's April 1, 2011 notation that Dr. Salas observed Plaintiff "walking briskly" in

the parking lot but then complaining of severe pain in the clinic, and that her physicians had concerns regarding "somatization disorder or factitious disorder." (*Id.*). The ALJ found that these statements "seriously undermine [Plaintiff's] credibility." (*Id.*).

The ALJ also found Dr. Salas' notes and reports "further erode [Plaintiff's] credibility." (R. 48). He made specific mention of Dr. Salas' November 23, 2010 report indicating that Plaintiff said she wanted to retire and was seeking his help in gaining disability leave so she could do so, yet the doctor found no more than mild issues with her knees and no deficiencies in her motor strength or range of motion. (R. 49). The ALJ determined this report "raises a question of whether the claimant's primary goal was to stop working or to get better." (*Id.*). The ALJ further relied on Dr. Salas' November 23, 2010 opinion that Plaintiff could return to her regular work duties on November 29, 2010, which the ALJ found "strongly suggests the claimant's condition was not as severe as she would have me believe." (*Id.*).

The ALJ also relied on other more recent reports by Dr. Salas, such as his December 2010 notes stating Plaintiff told the doctor she wanted to retire even though he found she had only mild joint tenderness and she refused orthopedic interventions; the doctor's January 27, 2011 recommendation that Plaintiff be evaluated by specialists since he had mainly been basing his disability leave recommendations on her subjective complaints; and his February 2011 explanation that his examinations did not show she was permanently disabled. (*Id.*). The ALJ determined that Dr. Salas' comments showed the doctor "did not believe [Plaintiff's] condition prevented her from performing her job with proper medication management and physical activity[.]" (*Id.*).

The ALJ also discussed at length that the medical evidence did not support Plaintiff's subjective complaints, including numerous medical examinations from October 2010 through May 2012 during which Plaintiff had no redness or swelling in the joints; a full range of motion; full motor strength; good ambulation; and reported good exercise tolerance and even occasional painlessness. (R. 48-50). He further discussed that Plaintiff's own physicians took note of inconsistencies between her subjective complaints and their medical observations, such as when Dr. Rothschild wrote in April 2011 that she was able to fully use her upper extremities and pull on her shirt despite her complaints of severe right shoulder pain. (R. 50). The ALJ also relied on the diagnostic imaging results in the record, including the mild to moderate degenerative findings in Plaintiff's November 2010 left knee and pelvic x-rays, and the similarly "mild" findings in her August 2011 right knee and lumbar spine x-rays, which he found only "support the modest degree of [Plaintiff's] limitations." (*Id.*).

Plaintiff challenges this ample credibility analysis by arguing that the ALJ was required to get an explanation from her about all of the facts he intended to use to discredit her before drawing inferences against her from those facts. (Doc. 13, at 6-12; Doc. 22, at 3). She cites SSR 96-7p, *Garcia v. Colvin*, 741 F.3d 758 (7th Cir. 2013), and *Murphy v. Colvin*, 759 F.3d 811 (7th Cir. 2014) in support. Plaintiff reads these authorities too broadly. The provisions she cites of SSR 96-7p and *Garcia* concern drawing negative inferences from a claimant's failure to seek medical care or follow-through with treatments. SSR 96-7p, 1996 WL 374186, at *7-8; *Garcia*, 741 F.3d 761-62. These authorities state that an ALJ must not draw such inferences without exploring whether the claimant has good reasons for his failure to obtain medical care

or consistently undergo treatments. SSR 96-7p discusses that a person might not seek medical care or regularly undergo treatments for reasons other than because their symptoms are not as severe as they say, such as religious prohibitions, because the side effects of the treatments outweigh the benefits, or for cost reasons. SSR 96-7p, 1996 WL 374186, at *8. The court applied this principle in *Garcia*, which concerned a claimant who testified that he had no health insurance, but the ALJ nonetheless found that he did not seek medical care because he was a malingerer. 741 F.3d at 761-62. The Seventh Circuit reversed, reasoning that the claimant may not have been able to afford medical care without insurance coverage, and so the ALJ should have further questioned the claimant before drawing a negative inference against the claimant. *Id.*

In *Murphy*, the Seventh Circuit reversed the ALJ's finding that the claimant was less than fully credible about her pain and limitations because she was able to take two vacations. 759 F.3d at 817. The court found that the ALJ's negative inference was unsupported because the record contained no information about what the claimant did on her first vacation, and on the second she said she mostly laid in the sun "relaxing" in Mexico. *Id.* The court also explained that the ALJ's inference might have been upheld had he gained some information from the claimant that she had engaged in strenuous activity while she was on her vacations. *Id.*

None of these authorities supports the Plaintiff's blanket position that an ALJ cannot make any negative inferences from the record without asking her for an explanation first. Rather, this Court more narrowly construes these authorities to require an ALJ to seek an explanation for any ambiguous evidence before a drawing negative inference from that evidence. As recognized in SSR 96-7p and *Garcia*, a

claimant's lack of or infrequent medical care despite complaints of severe symptoms could be due to symptom exaggeration or other reasons. And in *Murphy*, the evidence of the claimant's vacations was ambiguous since she may have engaged in activities that were inconsistent with her complaints of significant physical limitations, or not. In those situations, the ALJ had to inquire further before drawing a negative inference from the evidence. In contrast, here there are no ambiguities raised by the evidence that require further exploration.

Plaintiff further argues that there are a number of "inferences" the ALJ drew in this case that lack "the proper foundation" because she was not given a chance to explain the evidence away. The ALJ finds none of her arguments persuasive. She asserts that the ALJ did not sufficiently explain how the findings and reports from her treatment notes, particularly from Dr. Rothschild, discredit her testimony. (Doc. 13, at 6-8). She specifically cites many statements from that doctor that she says the ALJ should have questioned her about before discrediting her, including that she had been given various diagnoses based on inconsistent examinations; that she had "improved function when she is unaware of being observed" resulting in concerns she had somatization disorder or factitious disorder; that she was observed walking briskly but then complaining of severe pain immediately after; that her complaints could be "volitional/factitious"; and that she complained of lightheadedness and palpitations from Plaquenil when she had only mentioned lightheadedness a week before. (*Id.*). As Defendant correctly argues, there is no need for further explanation here when the plain meaning of Dr. Rothschild's statements—that Plaintiff does not appear to be as limited as she claims and may be exaggerating her symptoms—clearly undermines her

credibility. There is no ambiguity in this evidence that requires an explanation from Plaintiff.

Plaintiff also attacks the ALJ's reliance on the objective medical evidence, arguing that it shows she suffered from arthritis, other degenerative joint problems, and some limitations in movement (particularly in Dr. Carlton's consultative examination), making it "illogical" for the ALJ to discount her testimony based on the medical evidence. (Doc. 13, at 8-9, 11-12). She specifically argues that the ALJ "never mentioned in the decision" that she described multiple tender points during Dr. Carlton's examination, that he found were consistent with a chronic pain syndrome such as fibromyalgia. (Doc. 13, at 11). On this latter, point, Plaintiff is incorrect. The ALJ specifically wrote that Dr. Carlton noted Plaintiff complained of "multiple tender points throughout her body" but the examiner also found she had a "full painless range of motion in all joints except the knees and hips[.]" (R. 50). The ALJ determined these and other findings from that examination showed some "apparent symptom magnification" by Plaintiff, reasoning which reflects that he in fact considered the specific evidence she states he ignored. (*Id.*).

Furthermore, it is perfectly logical for the ALJ to credit Plaintiff with no more than modest limitations based on mostly mild objective medical findings. The ALJ's determination is further supported by the fact that Dr. Mack also reviewed Dr. Carlton's examination report and, based in part on those findings, determined Plaintiff was capable of light work with some limitations. (R. 51-52). The ALJ limited Plaintiff even more than was recommended by Dr. Mack, based on the full record. (R. 52). In contrast with the supporting medical opinion of Dr. Mack (which Plaintiff does not

challenge), Plaintiff cites no errors in the ALJ's logic or misrepresentations of the medical evidence. She argues he engaged in "cherry-picking" but does not cite any evidence that the ALJ ignored. (Doc. 13, at 8).

Plaintiff also argues that the ALJ should have allowed her to explain why the objective medical evidence did not support her subjective complaints, but this is nonsensical. (Doc. 13, at 9, 11). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Gully*, 593 F. App'x at 563 (quoting SSR 96-7p, 1996 WL 374186, at *5). The ALJ's decision to discount Plaintiff's testimony based on its inconsistencies with the record is sound and logical. Plaintiff further contends that an ALJ is not allowed to discredit her testimony about her symptoms based solely on the lack of objective medical support for them, but the ALJ did not do so here. (Doc. 13, at 12). He merely considered the medical evidence as part of the entire record in evaluating Plaintiff's credibility, as required. SSR 96-7p, 1996 WL 374186, at *1 ("In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence. . . ."). Contrary to Plaintiff's assertions, the ALJ has drawn a logical bridge from the medical evidence to his conclusions here, which is supported by substantial evidence. [3]

Plaintiff also challenges the ALJ's reliance on Dr. Salas' reports because the ALJ did not ask her about the incidents underlying these reports at the hearing, and she

---

[3] Plaintiff also briefly argues that the ALJ incorrectly equated her March 22, 2011 statement to Dr. Salas that she walked for 30 minutes a day, 3 times a week with the ability to do full-time work. (Doc. 13, at 11). But the decision shows the ALJ did not do so; he instead reasonably recognized that Plaintiff's self-admitted frequency of walking was evidence of "good ambulation and exercise tolerance." (R. 50).

argues the ALJ should have more fully discussed why these reports discredit her. (Doc. 13, at 10-11; Doc. 22, at 2). But there is no lack of a logical bridge here, and no need to seek any explanation about this evidence. Dr. Salas made repeated, unambiguous statements that his medical findings were mild and he thought she could work with proper medication and physical activity. The ALJ explained that this showed Plaintiff's "condition was not as severe as she would have me believe" since the doctor thought she was "not at the point for permanent disability." (R. 49).

The ALJ also considered Plaintiff's repeated statements to Dr. Salas that she wanted to stop working, and explained that the contrast between her statements and the doctor's findings raised a question as to whether her "primary goal was to stop working" rather than to "get better." (*Id.*). The ALJ's explanation that this evidence did not support Plaintiff's disability claim is reasonable and supported by substantial evidence. And contrary to Plaintiff's argument that the ALJ "discredit[ed] Plaintiff simply because her doctors disagreed with her[,]" the ALJ explained that he understood the determination of "whether a claimant is disabled under Agency rules" is a legal, not medical decision. (R. 49-50). Nonetheless, he found the doctor's "statements are very instructive as to the claimant's functioning." (R. 50). Thus, the decision shows the ALJ appropriately considered Dr. Salas' findings as part of overall record, and his consideration of that evidence does not require reversal.

Plaintiff also attacks the ALJ's statement that her July 2011 Function Report discussing that she did household chores and cooking at that time "contradicts some of [her October 2012 hearing] testimony" that her daughter did that work for her. (Doc. 13, at 6). She argues the ALJ should be more specific about what was allegedly

contradictory, and that there is no contradiction anyway because she alleged her condition worsened over time. She asserts, therefore, that the ALJ should have questioned her further on this topic before discounting her testimony.

Even assuming the Court were to agree that there is no contradiction, the ALJ's credibility finding would still be amply supported by the many other independent reasons he gave for discrediting her testimony. Moreover, Plaintiff testified that she was able to take care of her home around November 2010, but she stopped being able to do so "in January when the weather got really cold." (R. 30). Under these circumstances, her July 2011 report stating that she cooked, washed dishes, and did laundry at that time may properly be contrasted with her alleged inability to do so six months earlier in January 2011, particularly given the medical evidence accurately summarized by the ALJ.

### 3.    Medication Side Effects

Plaintiff further argues that the ALJ erred in his credibility determination by failing to discuss some of her medication side effects. (Doc. 13, at 4-13; Doc. 22, at 1-3). In making a credibility determination, the ALJ must specifically evaluate "the claimant's pain level, medication, treatment, daily activities, and limitations." *Schomas v. Colvin*, 732 F.3d 702, 708-09 (7th Cir. 2013) (citing 20 C.F.R. § 404.1529(c)). The ALJ's decision shows he adequately considered Plaintiff's treatments, including her medication usage, in evaluating her credibility.

The ALJ wrote that Plaintiff was repeatedly advised to use physical activity to treat her conditions, and such activity "ironically, was part of her job." (R. 49). The ALJ also wrote that Plaintiff was prescribed medications such as Tylenol, Lidocaine patches,

and Tramadol for pain, but was told by Dr. Salas that she could return to work while taking these drugs. (*Id.*). The ALJ further wrote that Plaintiff "refused completely the idea" of working with pain medication while also refusing other treatment recommendations, suggesting she was capable of working but had a "desire to retire[.]" (*Id.*).

The ALJ then discussed that some of Plaintiff's conditions, such as her diabetes, were controlled with diet alone, and other medical issues, such as her liver problems, underwent a "rapid resolution" through treatment with medication. (R. 51). With regard to medication side effects, the ALJ wrote that Dr. Rothschild found her complaints of side effects from Plaquenil notable because she complained of palpitations when a week earlier she had only mentioned lightheadedness. (R. 48). Regardless, the ALJ relied on the fact that by the time of her December 5, 2011 visit with Dr. Augustin, Plaintiff reported "100 percent adherence to her medication with no side effects." (R. 51).

Plaintiff argues that the ALJ committed reversible error by failing to specifically discuss her October 9, 2012 hearing testimony that Tramadol knocks her out and makes her sleepy, and the statements from her Disability Report filed by her attorney on November 9, 2011 that Tramadol and Lyrica make her dizzy and drowsy. (Doc. 13, at 4-5; Doc. 22, at 2-3). Plaintiff asserts that this shows the ALJ "ignored a whole line of evidence" and the case must be remanded so that the ALJ can make specific findings regarding her medication side effects. (*Id.*). She cites in support *Schmoll v. Harris*, 636 F.2d 1146 (7th Cir. 1980) and *Herron v. Shalala*, 19 F.3d 329 (7th Cir. 1994). These cases do not support her argument.

In *Schmoll*, there was "considerable evidence" in the record that the claimant's regular and heavy use of Librium had an adverse effect on her. 636 F.2d at 1148-49. Nevertheless, the ALJ specifically found that the claimant's Librium usage would not prevent her from working. *Id.* at 1149-50. The Seventh Circuit determined that there was no evidence to support this finding, and thus remanded the case for additional proceedings on the effect of the claimant's Librium usage on her ability to engage in substantially gainful activity. *Id.* at 1151. The court made clear in a later case, however, that it "did not hold [in *Schmoll*] that an ALJ has a duty to make specific findings concerning the side effects of prescription drugs." *Nelson v. Sec'y of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985). Rather, *Schmoll* was reversed because the ALJ's credibility finding regarding her medication usage lacked evidentiary support. *Id.*

In *Herron*, the other case Plaintiff relies on, the claimant testified that his medication caused him to lie down approximately 6 hours a day and take 3 hour naps, which would prevent him from working. 19 F.3d at 335. The ALJ did not specifically address the claimant's testimony about his medication side effects, but indicated he generally "doubted" the claimant's credibility because certain aspects of the testimony were inconsistent. *Id.* The Seventh Circuit determined that the ALJ's explanation was not sufficient, which left the court with no basis for upholding the credibility determination. *Id.* at 335-36. Therefore, the court remanded for the ALJ to better articulate his credibility determination. *Id.* at 336. Once again, the Seventh Circuit explained that "[t]he ALJ is not required to make specific findings concerning the side effects of prescription drugs on the claimant's ability to work." *Herron v. Shalala*, 19

F.3d 329, 335 (7th Cir. 1994). Instead, *Herron* was reversed because the lack of support for the ALJ's credibility determination meant there were no grounds to reject the claimant's allegations that he had disabling side effects from his medication. *Id.* at 336.

This case is completely distinguishable from both *Schmoll* and *Herron*. As noted above, the decision here shows the ALJ considered Plaintiff's medication usage, as required by the regulations. The ALJ particularly relied on the fact that at Plaintiff's December 5, 2011 visit with Dr. Augustin, she reported no medication side effects. (R. 51). The record indeed reflects that at that time Plaintiff was taking both Lyrica and Tramadol and reported no side effects. (R. 487-88). In fact, the record is replete with various instances in which Plaintiff denied any side effects from these medications, including her statement to Dr. Salas on February 16, 2011 that she was taking all of her prescribed medications (including Tramadol) but did not state she suffered any side effects; her reports to Dr. Rothschild on April 1 and April 8, 2011 that she had side effects from Plaquenil, with no mention of any other medication side effects; Dr. Viscarra's June 2, 2011 questionnaire response that Plaintiff was taking ibuprofen and Tramadol with no mention of side effects; Plaintiff's report to Dr. Carlton during his August 31, 2011 examination that she was taking Lyrica with no mention of side effects, and her affirmation that all of her medical complaints had been addressed; and Plaintiff's response to questions about her medication usage in her July 9, 2011 and November 19, 2011 Function Reports that she had side effects from Plaquenil, with no mention of any side effects from Lyrica or Tramadol. (R. 169, 188, 240, 271, 279, 304, 309, 313).

The first mention of any dizziness or drowsiness from Lyrica or Tramadol is in the November 19, 2011 Disability Report submitted by Plaintiff's attorney, and Plaintiff never made these complaints to any of her doctors, as far as the record shows. Consequently, this is not a situation like *Schmoll* in which there was substantial evidence of medication side effects that the ALJ unreasonably rejected. Nor is this a situation like *Herron* in which the claimant's allegations of disabling side effects were "uncontested" because there was no basis to uphold the ALJ's credibility determination. Instead, the ALJ in this case based his general determination to find Plaintiff less than fully credible on findings which are supported by the record, as explained in the previous sections of this opinion. As a result, this matter does not need to be remanded for the ALJ to discuss his specific consideration of Plaintiff's side effects from Tramadol or Lyrica, since the lack of discussion of those issues does not undermine the supportability of his decision.

In sum, the ALJ's credibility determination in this case is supported by substantial evidence, and does not require remand.

**B.    RFC Assessment**

**1.    Combination of Impairments**

Plaintiff next argues that the ALJ failed to consider all of her impairments in combination when determining her RFC. (Doc. 13, at 13-14; Doc. 22, at 4-9). A claimant's RFC is the maximum work that she can perform despite any limitations, and is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *7 n.8. "When determining the RFC,

the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'" *Craft*, 539 F.3d at 676.

The ALJ's RFC analysis in this case focused on Plaintiff's impairments that he found to be severe, but he also determined that her "other conditions do not cause any significant problems or limitations." (R. 51). Therefore, the ALJ considered both her severe and non-severe impairments in determining the RFC. He specifically discussed that Plaintiff's treatment notes show her "diabetes is under good control"; she did not report any treatments for her hepatitis C to the consultative examiner; her coronary artery disease does not require any frequent treatment; she generally denied any symptoms from hypertension and chronic kidney disease to her physicians; and in May and July 2012 her hepatologist, Dr. Dhillon, found that her liver cirrhosis and related liver issues were resolved with medication, and she had "no abnormal findings" from his examinations. (*Id.*). He particularly noted that the record contained no evidence of any "debilitation symptoms" caused by her liver disease. (*Id.*).

Plaintiff argues that this analysis shows the ALJ was only "brushing off" her diabetes, hepatitis C, kidney disease, hypertension, liver cirrhosis, and history of coronary artery disease, not properly considering her conditions in combination. (Doc. 22, at 4). She cites *Thomas v. Colvin* 745 F.3d 802 (7th Cir. 2014) in support, but this case is distinguishable. In *Thomas*, the ALJ found the claimant had back pain, leg pain, and respiratory problems, but since none of these conditions "imposed any limitations greater than that imposed by her back pain" she was not disabled. *Id.* at 805. This was an error because the ALJ failed to consider whether the "combination of impairments could impose greater restrictions than any of Thomas's impairments taken singly." *Id.* at

807. Here, the ALJ found no significant problems or limitations from Plaintiff's non-severe conditions, and thus the combined effect of the lack of symptoms from these conditions did not significantly affect her functional ability. (R. 51). The ALJ's determination that there was no evidence of any significant problems or limitations caused by Plaintiff's non-severe conditions is supported by the record, and Plaintiff cites no errors in his analysis.

Plaintiff briefly discusses some evidence that the ALJ did not specifically mention, including Dr. Sreih's September 2012 notes regarding her rash, and Dr. Dhillon's May 2012 notes that she had ecchymosis, or skin discoloration, on her lower extremities and had been diagnosed with mild depression and thrombocytopenia. (Doc. 13, at 14; Doc. 22, at 6). However, Plaintiff cites no evidence of any disabling symptoms or limitations from these conditions. Instead, as the ALJ accurately noted, Plaintiff reported no problems at her examinations from these issues. (R. 50-51). In fact, in the same notes where Dr. Dhillon recorded Plaintiff's ecchymosis, liver cirrhosis, lupus, chronic kidney disease, mild depression or dysthymic disorder, thrombocytopenia and other conditions, he specifically noted she was "generally healthy" and had "good responses" to treatments. (R. 500-01). The ALJ particularly relied on Dr. Dhillon's comment that Plaintiff was "generally healthy" despite her conditions. (R. 50)

Plaintiff also argues that the ALJ should have credited her testimony that her liver cirrhosis caused her fatigue, but again cites no evidence that the ALJ misunderstood or overlooked. (Doc. 13, at 4; Doc. 22, at 4-5). On the other hand, the ALJ's decision not to fully credit her testimony, as explained in the previous section of this opinion, was well-supported, and he also accurately relied on Dr. Dhillon's findings that she had no

substantial liver cirrhosis symptoms. Contrary to Plaintiff's argument, the ALJ's reasoning here that her non-severe conditions caused no significant problems, limitations or disabling symptoms that should affect his RFC determination is supported by substantial evidence.

## 2. Bunions, Fibromyalgia, and Obesity

Plaintiff particularly argues that the ALJ committed reversible error when he "ignored the evidence of bunions, fibromyalgia and obesity" in the record when determining her RFC. (Doc. 13, at 13-15; Doc. 22, at 5-9). Regarding her bunions, Plaintiff argues he ignored her testimony that her bunions caused severe pain when she walked. Contrary to her argument, the ALJ did not ignore this evidence. He expressly wrote that Plaintiff complained "she had severe pain from bunions" and when she walked around her house she had to stop and rest because of that pain. (R. 47). Nevertheless, as explained above in the credibility section of this opinion, the ALJ generally found Plaintiff's complaints of pain and limitations were less than fully credible. (R. 48). This sufficiently shows that the ALJ considered Plaintiff's allegations about her bunions but did not fully credit them.

The ALJ also did not ignore the symptoms from Plaintiff's alleged fibromyalgia. He specifically referred to Dr. Carlton's finding that Plaintiff reported multiple tender points throughout her body during his August 31, 2011 examination, (R. 50), which Plaintiff asserts is "the point that most favored allowance of [her] claim." (Doc. 13, at 14). However, the ALJ contrasted this subjective complaint with the generally mild findings of limitations resulting from her conditions in the objective medical evidence (including other findings by Dr. Carlton), and her limited credibility. And in fact, the

record shows that Dr. Carlton also did not actually diagnose Plaintiff with fibromyalgia, nor does she cite any records which show she was affirmatively diagnosed with the condition. (R. 312-13). She cites, for example, notes by her doctors in which they recorded that she reported being diagnosed with the condition by a rheumatologist, (R. 492), but no reports actually discussing the basis for that diagnosis, nor discussing any symptoms or limitations caused by her fibromyalgia which the ALJ failed to consider. In short, Plaintiff cites no evidence which undermines the ALJ's thorough analysis.

As for her obesity, Plaintiff cites evidence from November 2010 and February 2011 showing her doctors found her obese at that time. (Doc. 22, at 5). But the record shows that Plaintiff's weight decreased over time and that by February 2012, her doctors found her weight was below the obese level. (R. 512). She also does not specify any impairments or exacerbation of impairments that her obesity caused, or cite any evidence in support of any limitations caused by her weight.

True, the ALJ did not expressly discuss Plaintiff' weight or obesity in the decision. But, as the Commissioner argues, the ALJ's failure to do so does not require remand where the claimant's obesity is "factored indirectly into the ALJs decision" when he "adopts the limitations suggested by the specialists and reviewing doctors who were aware of [the claimant's] obesity." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, the ALJ gave moderate weight to the opinion of Dr. Carlton, who expressly considered Plaintiff's obesity when examining her and giving an opinion on her functionality. (R. 51). Dr. Carlton's opinion in turn was interpreted by Dr. Mack, along with other evidence, to require that Plaintiff be limited to light work with only occasional climbing, stooping, kneeling, crouching or crawling. The ALJ specifically

noted that Dr. Mack supported his findings with Dr. Carlton's opinion, and the ALJ adopted the limitations Dr. Mack imposed.  (R. 47, 51-52).  Based on the foregoing, the decision need not be remanded for the ALJ to further discuss Plaintiff's obesity.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 12] is denied and Defendant's Motion for Summary Judgment [Doc. 20] is granted. Judgment will be entered in favor of Defendant.

ENTER:

Dated: May 26, 2015

_Sheila Finnegan_
SHEILA FINNEGAN
United States Magistrate Judge